Our next case for argument is SEC v. Equity Bill, the appeal of BC57. May it please the Court. My name is Andrew DeVoe and I represent BC57, the appellant in this matter. Your Honor, may I please reserve five minutes for rebuttal time. This case involves the recognition of two distinct legal concepts. First, when a debt secured by a mortgage is paid, the lien of that mortgage is extinguished as a matter of law and unenforceable. Second, when such a debt has been paid, pursuant to the Illinois Mortgage Act, the prior mortgagee upon request must draft and deliver, within 30 days, a release of record evidencing that payment, which can then be publicly filed to aid owners and lenders in keeping the chain of title. These concepts do not conflict, just the opposite. They work together to help ensure the free alienability of land and the clarity of title in the real estate market. But the District Court erred in this case by concluding that the Illinois Mortgage Act replaced the common law rule of extinguishment, such that a mortgage lien, regardless of whether that debt securing that lien had already been paid in full, remained enforceable until a release of record is requested and delivered. There is no support in the Illinois Mortgage Act itself, the legislative history, or the relevant case law to support that conclusion. Just as importantly, we have the unique opportunity with the Illinois Land Title Association and their real-world perspective, from a hundred years' participation in this field, confirming the coexistence of these two distinct legal principles, and similarly forecasting, far beyond the scope of the parties in this case, problems and disruptions that could result in the real estate market in Illinois if the District Court's ruling is appellate. What are we to make of the Illinois appellate court cases that I know aren't controlling, but that talk about the act and find that essentially common law hasn't survived, like North Shore and some of the other cases? Yes, Your Honor, so I think North Shore holding is best understood as limited to the effect of the lack of the delivery of that release. And I've submitted the briefing in the separate appendix, Your Honor, so you can see the briefing of that issue. Blue Water and Premier were the two entities, and the main issue in the case was about a mechanics thing. But the initial issue was whether or not North Shore, the bank, had standing, because the mortgage had been paid, and a release had been executed but not delivered. And they relied on the Illinois Mortgage Act for this notion that payment meant that then there was an automatic release. But Your Honor, respectfully, I don't think that decision reached the question here, because there was no consideration of the common law, no one cited it, no one discussed it. And this is in 2014, two years after the Illinois Supreme Court had decided Rush University Medical Center, where we cite in our brief, lays out the clear rules for the appellate courts in Illinois, not the 7th Circuit, but for the Illinois appellate courts to follow whether or not there was legislative abrogation. And there was none of that analysis, Your Honor. And I think it was likely the way that the issue was presented to the court, but it just didn't, I think it's best read as not reaching that issue. Can I ask you about another case that was 14 years before, the one that you just cited? It's Coupier, or Coupier, K-U-I-P-E-R, Illinois Appellate Court in the year 2000, saying until such a release, such release is filed, the mortgage lien remains in effect, and goes on to hold, because no release of lien had been filed pursuant to Section 2 of the Mortgage Act, there was no indication to third parties that the lien was ever extinguished. So it seems to me we have the Illinois Appellate Court in 2000 looking at the interplay between the Mortgage Act and the common law, and saying what the individual investors are claiming. Your Honor, I think that in this case where you have, again, there's no analysis there, I would say that the common law has been overruled. I think that what's important here is that in this instance, we have a law going back to the 1800s, and there's been no attempt to actually reconcile. I think often what happens is there's this conflation, as we have with the Appellees, respectfully, that a conflation of the concepts that the release of record, and partly because I know the term release is tossed around in so many different contexts, but the release of record is documenting what has already happened, and there's a conflation of the two that... I'm not really talking about the release of the mortgage. It specifically says that that remains in effect unless the release pursuant to the Mortgage Act. Yes, Your Honor. I don't have that case in front of me, and I can address that in rebuttal, but I think that the case that the plaintiffs have, or excuse me, the Appellees have primarily focused on with North Shore, it clearly does not, cannot be held for the proposition that the common law has been superseded. And I think primarily, Your Honor, that again, that was... Why isn't it, while it may not be controlling, I agree, why isn't that at least persuasive for us of where the Illinois courts are going? I think because it hasn't engaged in any attempt to reconcile the two. I mean, there's no attempt to look at the statute, to look at the framework. Properly understood, the framework of the statute fits hand in glove with the common law. The common law and the notion of, the common law is the idea of the extinguishment of the lien. I think that's exactly what this Coupere case does do. So you'll be able to take a look at that, but let me ask you this. Do you have a case after 1961 that says what you need to say, which is that mere payment extinguishes a mortgage lien? Yes, Your Honor. So Dunas from the First Circuit, excuse me, First District, 1963, similarly, Your Honor, and I think that's noteworthy because Dunas is in the First District, which is where the North Shore case was decided. Similarly, That sentence, you're going to point us to a sentence in Dunas, right? I'm trying to understand why that is not dicta here. Go ahead. Let me hear what you're going to say about Dunas is different from what you've said in your brief. Well, no, Your Honor, I think it's just pointing out that you have a case two years after the enactment of the Illinois Mortgage Act, specifically relying on the Illinois Supreme Court's decision in Marcus. And so from 1940... But Simos didn't talk about the act at all. No, Your Honor, did not talk about the act. Perhaps because the transactions predated the act. Yes, Your Honor. And so... All right. So let me rephrase my colleague's question. Do you have any Illinois case after the act where the transactions themselves occurred after the act? Yes, Your Honor. So Rockford versus Rios is a case from the Illinois Appellate District where the court specifically found that where the subsequent holder of the mortgage had paid the underlying lien, that even though it went to Roe, which was the servicer, and did not make it to Rockford, that in that instance, Rockford was not entitled to foreclosure, and that the subsequent financier was entitled to a release. And that's consistent with the common law rule. So... But the Rockford case certainly suggests that the release... That absent the release there, that the mortgage was still in effect. Your Honor, but the premise in the trial court was that the bank couldn't foreclose because the debt had been extinguished, such that the lien had been extinguished. That's the holding of the trial court. And then on appeal, that case focused on the notion of the money going to the servicer instead of to Rockford. And because just like here, where the servicer was expressly authorized, as the district court found with respect to equity bill of finance, that the servicer received those funds, and therefore there was no duty to look past the money payment to Roe, the servicer, versus the money going to Rockford. And that's exactly what happened here. In this case, under the common law, BC57 paid the underlying debt of the investor lender's mortgage. They paid it to equity bill of finance, the express agent, for payment purposes. Is there any evidence that anybody with your client took any... Did any due diligence on equity bill or equity bill of finance? Yes, Your Honor. So first of all, yes, Your Honor. They did take steps in this case in terms of hiring the title insurance company and acting as their agent. They had their lawyer going through. They looked at the underlying records, which is what you would do on inquiry notice. And I think that's a really important point. Document number 1118, which is filed by the receiver, explains that if the court... It files the Fraudulent Transfer Act in its claim. Those sorts of issues will be squarely addressed, as Judge Shaw noted, on the notion of inquiry notice if this court were to determine that BC57 has priority. But as the receiver said, those are issues that would be achieved at that time. And that would be an analysis the court could take. But Judge Shaw specifically did not reach that issue of inquiry notice. And so I think that most important here are Section 9A of the Collateral Agency and Service Agreement specifically authorizing issuing the payoff statement and specifically authorizing the equity bill of finance to receive that payment. And pursuant to that common law rule, that was an extinguishment of the lien. And therefore, the only net remained was BC57's lien. And I just want to go back to, with the Illinois Appellate Courts, again, when you look at the framework of this statute, I also want to point out the Illinois Supreme Court has told us, under Rush University Medical Center, that when looking at a statute, if the common law provided greater protection than the statute purports to provide, but that there's not a tension between the two, that it's better to find that they're consistent and the statute is effectuating that protection. And that's absolutely here. I think you've got a real dispute on that here, though, because BC57 is arguing for a world where someone can pay off the debt and nobody will know. Your Honor, respectfully, I don't believe that's true. And the receiver says we're asking for a world where we can just pay anybody. That's just not true. In this instance, it's clear, and Judge Shaw didn't agree, or he agreed, pages 15-17. And the appellees admit on pages 18 and 19 of their brief that there was authority for equity-billed finance to issue. It's the critical one point of agreement, I think, on this issue, that there was the express authorization to issue the payoff statements and for equity-billed finance to receive the payment. So, Your Honor, we're certainly not asking for this notion of can pay anybody. And the notion of diligence and the like is an issue that will be addressed on inquiry notice. There's no question. But the receiver has said that issue is moot until deciding the issue of priority in document 1118. So, that critical agreement on the issuance of the payment. But I want to, the protection of the common law, Your Honor, it followed the money. If someone paid the debt underlying a lien, that lien was extinguished. And now, if the appellees are right, then the Illinois Mortgage Act, the protection afforded to that same party, is that they could pay the underlying debt and they're up to 30 days. And the only protection is you could go to court and pay $200. And it was actually $50 in 1961. It's an administrative compliment, properly understood looking at the framework. And furthermore, it's only upon request. So respectfully, as being on request, if a mortgage or an individual mortgage or a house as the ILTA features doesn't ask for one of these release of record, which is memorializing what happened, then the idea that they wouldn't be protected, that conflicts with the notion of what the Illinois Supreme Court has told us. I similarly, I just want to touch briefly on, in terms of the releases, I don't think this court has to reach this issue, but if you were to reach the issue that the release records are necessary, there was authority here, the documents don't render each other superfluous. The collateral agency and servicing agreement says that you need written instructions for termination and amendment or foreclosure. In this instance, the authorization document, these are in a packet of materials in Exhibit 14 for document number 1160. And when you look at those, they're a packet of materials and they're separate documents. The authorization document that Judge Shaw analyzed, and there's a sample of it on page 19 of his opinion, that document is a separate document effectuated and it specifically provides authority regarding one specific task. And that is to- But it doesn't say to the district court that the releases themselves were not facially valid, do we? That's correct, Your Honor. And I think it's one point I would briefly address is just that when you're looking at that in our arguments regarding Scrivener error, every document in this case, the collateral agency servicing agreement, the authorization document, the mortgages themselves, the promissory notes, they all demonstrate the relationship is between the investor lenders who had complete transparency- But what about the contrary evidence? And it's your burden to establish this by clear and convincing evidence. What about the contrary evidence showing that Equity Build, not Equity Build Finance, was in fact issuing the releases and the fact that the original payoff letters directed your client to send the payoff directly to Equity Build? In light of that and the equitable nature of this proceeding, how can we find that the district court erred? Your Honor, taking that one specific example, in that email thread, that error was corrected as a part of the process. I think hindsight is a powerful tool in the context of a case like this, looking back- It sounds like you're asking us to re-weigh what the district court- No, Your Honor. I think just it is true that abuse of discretion I think applies to the last component with the releases. I think that's right. I think the others are questions of law. I agree and acknowledge that that is abuse of discretion. I think what I just point Your Honor to is that every contemporaneous document that the district court issued transparency to demonstrated this relationship, and that error about whose name was on there was corrected. They also fully understood the relationship, respectfully, the investor-lenders understood the relationship between the borrower and the servicer, and there's unrebutted expert testimony that that's not uncommon in this industry. So I just would say that, Your Honors, when you look, you have this unique perspective of the ILTA that is unrebutted by the appellees of how everyone in the industry understands these things to work. Thank you, Counsel. Mr. Stein. Good morning, and may it please the Court. I'm Max Stein, one of the attorneys representing the certain individual investors. I will be addressing the arguments about the effect of the release at issue in this appeal, and my co-counsel, Mr. Augenlicht, will be addressing the arguments regarding the Illinois Mortgage Act. I'm going to go off script here a little bit and jump to the last point my opponent just made. He makes a big deal about the fact that the title insurance industry has filed an amicus brief here and that it is unrebutted. It is also entirely self-serving, and in this case, in the event that the district court's review is reversed and BC57 is held to have the higher priority lien, then the title insurance industry will be off the hook. And while that's not a relevant consideration for determination of liability, here in this equitable receivership, that is an appropriate thing for the court to weigh. And so the word of the title insurance industry should not be taken as some sort of wisdom from on high, but rather as the self-interested words of the industry that is trying to defend what Judge Shaw correctly noted was sloppy practices. Because that's the other thing I want to address. The record here is clear. BC57 had the opportunity to do due diligence, and it completely failed to do it. It completely failed by first outsourcing that due diligence to its title insurer and then relying on that title insurer entirely. BC57 did nothing to find out about the source of the authority upon which it now relies. My opponent talked about the servicing agreement and the authorization document. Is there any evidence or any suggestion here that BC57 knew of the fraud that was going on? Knew of the fraud? No. But it did know that there were documents out there that it did not even bother to ask to look at. Is there any evidence that your clients knew about BC57? No, there's not, Your Honor. And I want to go to the servicing agreement and the authorization document. BC57 never saw them. Its lawyer didn't see them. Its title insurer didn't see them. It just did not bother to look at them. Now that it finds itself in this equitable receivership, it is relying on those documents that it never saw and claiming that those documents somehow granted rights that the documents themselves don't even actually grant. The authorization document does not give authority to release the liens. First off, I want to give credit. The authorization document doesn't even bear that title. That's a bit of clever rhetoric that BC57 used, and it stuck. But in reality, that single piece of paper at one page in the loan packet has no title and primarily serves to memorialize the amount of the individual investor's investment and how much of the mortgage that investment equates to. That's what's at the top of that document. I take the district court on that point. He can't go quite where BC57 is going with titling this document but can't quite go where you are either saying the primary purpose of this document is the stuff at the top when there's this clear language at the bottom. So I think you don't even need to go that far to make the argument you want to make about what the paper does. Fair enough, Your Honor, but it is also true that the servicing agreement that BC57 never saw contains at least four provisions that say that the servicer is not authorized to release the mortgage without written instruction. And so we have to find the written instruction somewhere. The documents of the loan package have to be read together under Illinois law. And so reading them all together, the best reading, as Judge Shaw concluded, is not that the authorization document provides the written instructions but rather that the written instructions have to come from someplace outside of the loan package because otherwise the protections in the servicing agreement would have had no meaning and would have been of no effect. The individual investors who made these loans relying on the fact that they were going to have first position mortgage liens would have relied on that fact and eliminated it at the same time. And that doesn't make any sense. It is a much better reading of the entire loan package to give meaning to the four provisions in the servicing agreement that require written authorization than it is to give meaning to the three lines on a single page that is doing multiple things. And we should also remember this was a fraud, and BC57 was the second lender here. So BC57 knew the individual investors existed, knew they had a first position mortgage lien, and it is BC57 that failed to do adequate due diligence to determine whether equity-billed finance could actually release that mortgage. What we actually see in the record is not a Scribner's error, not mutual mistake. What we see in the record is that equity-billed finance and equity-billed ink would tell BC57 whatever BC57 needed to hear to get a loan. And it is on BC57 that it failed to do the due diligence that would have allowed it to say, wait a second, you can't have the borrower release the mortgage.  And you can't say that you have the authority to do that if you haven't provided the actual written instructions that the servicing agreement that you say gives you that authority requires. And for these reasons, we believe that you should affirm the holding of Judge Shaw in the district court. Thank you, Mr. Stein. Mr. Augenlicht. May it please the court, my name is Robert Augenlicht. I'm an attorney representing 1839 Fund 1, which is one of the individual investors. I'm here to address the second portion of our response brief, which argues that the court below correctly ruled that the Illinois Mortgage Act replaces a common law rule that payment alone operates to automatically extinguish a mortgage. Do you agree, before you get into the substance of that, that that is a question of law that we should review de novo? Yes, Your Honor. That would be a question of law. I'd be hard-pressed to say. I know this is a proceeding in equity, but that seems like a good question. It's a specific issue, Your Honor. It's unquestionably a question of law. I think it's important to note here that BC 57 brings this as an alternate argument in which they're attempting to assert that even if they do not have bona fide purchaser of value status, that the payment alone to some agent of the mortgagee is sufficient. The Illinois law does not support this contention. I would also note that even the cases that BC 57 relies on, none of them in all of those cases the subsequent lender was found to be a bona fide purchaser of value. So even on its own terms it fails. But more to the point, Illinois law does not recognize this principle that payment by itself operates to extinguish a lien. You agree, though, that Section 2 doesn't discuss how to release a mortgage lien. Well, it discusses how to release a mortgage lien. It doesn't discuss how to extinguish a mortgage lien or what it means for a mortgage lien to be extinguished. So you don't have a plain language. How can you say that the plain language of the statute addresses this? Well, Your Honor, this concept that there is a distinction between these two things finds no support. Appley provides no support for the idea that there is a distinct concept in Illinois law between the releasing of a mortgage and the extinguishment of a mortgage. The Illinois Mortgage Act, the argument here is that the act entitled the Illinois Mortgage Act somehow doesn't regulate how mortgages operate, and that simply makes no sense. What about the fact that it doesn't specifically abrogate the common law? Your Honor, so it does not specifically state that it's there to abrogate the common law, but one of the tests that we see in Illinois common law for whether a statute operates to abrogate the common law is whether or not there is an irreconcilable repugnancy. Here the statute contains mandatory language, shall be released, and superseding language, only in the manner provided herein. That is simply incompatible with only in the manner provided herein is simply incompatible with in addition to other methods recognized by common law. I would also point out that this concept that if you look at further statutes, this concept that a loan, that a lien is extinguished by payment isn't supported. So the Illinois Mortgage Act references the Illinois Certificate of Title Act, which provides an alternate route for releasing a mortgage. That act says that if a title company has received a payoff letter and has then paid the funds per the direction of that letter, it is authorized to itself release a mortgage. But it places an important caveat on that. It says that the title company cannot do that if it knows that the lender objects. If the lien is extinguished, then the lender's objection would be meaningless. What power could the lender possibly have to object if upon having the payment that was requested made, what power could they have to object to it if it works the way that BC 57 says? I would point to two cases that we have in our brief. In addition to the Creepers case, which the court asked counsel about earlier, the North Shore Bank v. Sheffield Wellington case and the Ames Capital Corp. v. Interstate Bank case. I think the important thing to take from both of those cases, in addition to the fact that the North Shore Bank case specifically says that other methods of releasing a mortgage or that payment alone is not enough, is that in both of those cases, even after full payment was actually made to the lenders, which the court found did not happen in our case, but even after full payment was actually made, the lien continued to do something. In the North Shore Bank case, the unreleased mortgage continued to allow the bank to participate in the litigation. That's a significant legal right. In the Ames case, the unreleased mortgage allowed a new lender to be subrogated to their position over lenders who recorded their mortgage as senior to them, which means that a mortgage, and the court was careful to note, that the result would be different if the release had already been filed prior to the new lender coming in and recording their mortgage. Thus, we have three different instances, both the Illinois Title Act and these two cases, and the Creepers case, which is also a subrogation case, wherein mortgages keep doing something even though full payment was actually made, which, again, didn't even happen in our case. The North Shore Bank case is even stronger in that a release was actually issued, yet not recorded. And that was the court's point, was that simply the release itself isn't even enough. There must be delivery of the release. I would just like to go with the little bit of remaining time I have left and address some of the sort of doom and gloom arguments that are presented, namely this idea that if this rule is somehow, that if the plain language of the statute is upheld, that the mortgage industry would collapse. All of these issues of how a mortgage is released and what takes effect and who has what burden to do are policy considerations. Here, the legislature has said that the policy consideration favors burdening new lenders to make sure that the person releasing their mortgage actually has authority to do so. I request that the court confirm the decision of the court below. Thank you, Your Honors. Mr. Rocklees. Good morning. May it please the court, counsel. Michael Rocklees. I'm one of the attorneys that represents the receiver in this action. I wanted to just follow up on a couple of points that Judge St. Even, your questioning, has raised in regards to the work of the district court, the role of district court, and the role of this court in this setting, which involves an appeal of a distribution plan. As the court's question makes correctly clear, the district court has wide discretion in its role and exercised that discretion properly in its determination of what is, in this context, really a fact question in regards to the agency issue, which is really another point here which the court properly noted is the role of this court in a review of those issues. The court correctly notes that this is not a reweighing of what the district court had done. Both the wide discretion of the district court, the role of this court, has been repeatedly raised in cases that this court has issued, whether it be wealth management, whether it be enterprise trust, where Judge Easterbrook wrote that opinion, and other cases. It doesn't matter who writes the opinion to the court. They speak for the court. Absolutely right. A few comments also on some of that evidence on agency that has been raised. As noted, agency is a question of fact, and so it is correct that the receiver did submit an avoidance disclosure, but that is not a way of suggesting that there is not a burden that was on the litigants themselves who were dealing with the priority question in order to raise those issues and meet a specific burden, which Judge Steney had discussed in your questioning before, in regards to that issue. BC-57 did not, its facts, as the district court found, did not meet its burden of proof on that issue. I note one note in particular, just as an example of the evidence before the court in reaching its conclusion, involved what is cited to now as the mortgage, or mortgages that are on file. They claim that there is express actual authority given to EBF, or equity-built finance, by reference to C-0. So on the face of the mortgage, it lists out dozens of investors, C-0, equity-built finance. Their claim is that that provides the actual authority that they are now relying upon, in part. If you look at that, if you look back at the mortgages, they do not express any reference to actual authority to release a mortgage without the investor lender's consent. Importantly, compare that to the other documents that they had in their possession. For example, the releases, which provide no such authority, which provide different names in terms of equity-built, equity-built finance, no C-0. There's clearly, when you look at the totality of the evidence presented to the court, none of which, by the way, the process is not being appealed. These summary proceedings that the court had initiated, the claims process, the sales process, none of those are on appeal, other than this very narrow issue. It's clear that the district court properly exercised its review. It should be affirmed. The case is taken under advisement.